v. Aeroflex et al., 2011-1199, Mr. Brubens. Thank you, Judge Lurie, and may it please the Court. This appeal relates to one of the largest taxations of costs in a case that was resolved on summary judgment. The District Court taxed $939,000 worth of costs. In this appeal, we challenge three categories of that taxation. The first category relates to whether an electronic review database that the parties agreed would be set up is properly taxable. The clerk initially declined to tax that. The District Court reversed that, finding it to be a form of exemplification. The second category is whether $469,000 of other photocopy costs were appropriate. Copies of what? I had a hard time figuring out from the briefs and the appendix what the documents were being copied and by whom. All of these copies were made by Appley Synopsys and the seven accused infringers. For RICOH or for themselves? Well, we believe most of them were for themselves. How do I know whether the copies were made for RICOH or for Synopsys? The production numbers reflected in the invoices reflect 128,047 copies of hard copy documents were produced to RICOH. Everything else, of which there is more than $322,000, has no relationship to any production number. It is also apparent that, contrary to Local Rule 54.3, that Synopsys included in its taxation, and the District Court awarded, copies for all of the pleadings, which cannot be taxed under Section 1920. The Supreme Court has ruled in Crawford Fittings' case that courts must rigidly control, put rigid controls upon the taxation of costs. And it is through that prism that this court— If Synopsys made a production of documents to RICOH, and they made a copy of the production for themselves, would that be taxable? Under the rules, the copy cost for the production, the defendants have the originals themselves. And so the courts have said, for the copies for production, that is taxable. Production to us. The copies that they gave to RICOH. That's correct. But making a copy of the production for themselves is not taxable? Under the case law, it is not taxable because the courts have said, you have the originals, and a copy you make for yourself is for the convenience of counsel. And convenience of counsel costs may not be taxed under Section 1920. Which circuit case says that that's not taxable? Well, starting with the—well, it's Ninth Circuit cases say that that is not taxable. The—and I refer the court to the cases that we cite. I believe it's on page 32 of our brief. There is the Keymart case, the disc golf case, in which the Ninth Circuit reversed copies of—copy costs that were made, but taxed by the district court. In the Haagen-Dazs case, the Ninth Circuit case, the district court awarded only half of the copying costs, finding that there was no showing that the other half were necessary for the case, rather they were just for the convenience of counsel. So what's your best Ninth Circuit case that says, if you make a copy of a production for yourself, it's not taxable? I believe it is—well, for the best one, I mean, what comes to mind immediately is the Summit Tech case, but that's a federal circuit case in which Judge Breisinger wrote the opinion— Applying first circuit law. I'm sorry? Applying first circuit law, right? It actually looked for law across the circuits because it found no guidance in the first circuit on the dispositive points. For example, it found nothing dispositive on what constituted exemplification. But the question ultimately is, both in that case and in this case, is what would the circuit in question have done or what has it directed to be done, right? That is correct. So we, in that case, as best we could, and now in this case, as best we can, have to determine what the regional circuit would do with the cost issue. That is correct, Your Honor. And referring to the local rule, Local Rule 54-3 permits the taxation only of— and it's in the very back of our brief— initial disclosures or original responses to discovery. And so that is the—and I should note, of the $469,000 of other copy costs that were taxed, we are not challenging $147,000 of those costs. We are challenging $322,000 of those costs. Now, included in that category, $322,000 of costs, are the costs of media. For example, Synopsys produced many of these documents to RICO electronically by shipping to us DVDs or CDs. The cost of those media are included in the taxation of costs, and we are not challenging that. We believe that is fine, that is acceptable. And any costs that we incurred in the printing of those, we have borne those. Now, in certain other cases, there were photocopies made of documents that had production numbers. To the extent that we can tie those to the production numbers, we are not challenging that. Even though, Judge Dyke, some of those copies may have been for Synopsys' own benefit, because, as we have documented in the attachments to RICO's motion for review of the taxation of costs, we were not able to correlate the production of documents to RICO with those invoices. So what you're saying is if the document didn't bear a Bates number, you can't assume that it was produced? Is that the idea? No, if the invoice that reflects the copying does not have Bates numbers referred to Bates numbers for the documents, there is no way, there is no evidence whatsoever to show that that document was within the scope of 1920, i.e. a document. Because you can't tell whether it was produced in the case? Well, we can't tell what the copy was for. We have, for example, if Synopsys made six copies of a brief for internal purposes, that is not taxable cost. The local rule plainly says briefs are not taxable. And yet we have these invoices for copies that have no reference whatsoever for what those are for. What we do know is that 128,000 pages of documents were copied pursuant to those invoices, because those are the Bates number ranges that are reflected. So we are allotting to Synopsys more than a dollar per page for those photocopies that were actually produced. That, to me, is eminently reasonable. It is Synopsys' attempt to include in it that additional $322,000 of costs. That's one category. Let me turn, if I can, to the other category, the electronic database for the cost. Before you go there, let me just ask you about one of Judge Ware's observations in which, with respect to the copying costs, he chopped 33,000 roughly off on the ground that the extra copies and CD-DVDs were not reasonably necessary for use in the case. What was that reference to, and what was he, in your view, why was that inadequate to address the problem of multiple or additional or too many copies? Well, first of all, that was less than 5% of the total copying cost claim. And second, we had produced a detailed Exhibit E to my declaration for the review of costs. It was more than 110 pages long, in which we identified and itemized each invoice and explained why there was, for the challenge costs, no basis whatsoever to connect those with appropriate costs under the scope of 1920 applying the rigid controls as instructed by the Supreme Court. Judge Ware agreed with $32,000 of those costs. And we have his opinion, which he doesn't go into any detail other than he looked at those and said, well, I'm not going to allow those. Well, where I'm going with this is that, and Summitt has language to this effect, it is not infrequent in these situations that you can't track every piece of paper and you have to make some approximations. So the appellate courts have given district courts some leeway about saying, well, I'm going to cut the cost here in half because that is a rough horseback estimate of what probably was used and probably was just convenience of counsel. Why isn't that kind of rough horseback approach appropriate in a case like this? Well, first the answer is, under the Supreme Court's instruction, where rigid controls need to be provided, it is the movement, here synopsis is burden of proof, to show that every claimed cost falls within the scope of 1920. But you wouldn't say they've got to show every single piece of paper in the copy? Well, I think that it is appropriate to require a movement to meet their burden of proof. That's an unobjectionable proposition to answer.  And here, that simply has not been the case. Now, in our analysis, we have divided it in these three categories, but digging into each of those three categories, as you did in the Summit Tech case, and a few months later there was an unpublished opinion, the Kinzenbaugh case, we haven't cited it because it's unpublished, but Judge Dyck and Judge Bryson, you were on that, and this court went through line by line, item by item, for each of those costs to figure out what is appropriate because the question of whether something is within the scope of 1920 is a de novo question. And that is appropriate for this court to make that inquiry, and that inquiry did not occur here. With regard to the costs for the electronic document review database, the Stratify database, this is a database which, after RICO prevailed on a motion to compel the production of these documents because Synopsys was refusing to produce and it was claiming that The problem that I see with respect to that is, aside from these few instances in which the database was used to purge privileged documents, it seems to me that the record is pretty clear that the database was used for production purposes. It may have been perhaps an unnecessary feature of the production, that the electronic emails could have been produced in native form, but there it is, and the parties agreed that that's the way the production was going to take place. So it seems to me that privilege purging aside, that this was used for the production, no? Well, from this database, there were a total of 16,000 pages actually produced. If I could analogize the Stratify database to a warehouse, a repository in which original documents are placed for inspection, and out of that inspection of these millions and millions of pages, only 16,000 pages were selected for actual production. And those are the costs. We are not challenging those costs associated with the production. But, and the parties agreed, the Stratify... No, it's not just 16,000. They elected to copy 16,000 documents. The production was this enormous thing, everything that was on the Stratify database. Those were produced, right? Well, the contract that the parties signed acknowledged, and I'm quoting, it was an electronic discovery services for document processing, review, production, and hosting. But the database was, they said, you know, here it is. Here's the database. Here are the things. Well, there's no question that the emails and electronically stored information was loaded into, and it was actually two distinct databases. RICO could not review the Synopsys database. Synopsys controlled the content of the RICO database. The information was first loaded in the Synopsys database, and Synopsys reviewed it, inspected it, made sure it was appropriate for whatever it wanted, and then authorized the transference of that into the RICO database, and each side could do their inspections of documents within their respective databases. Now, occasionally, when Synopsys realized that information, privileged documents had been put into the RICO database... There's no evidence that the database was used by Synopsys for the convenience of counsel or its own preparation for trial or anything like that, right? Well, we have letters and emails in the joint appendix in which they acknowledge doing their own searches in their side of the database, and in which they had, at one point, had produced documents... Searches for what? Well, that would be all work product. We don't have that. We do know that, for example, with the source code, they were produced to us in a non-searchable TIFF format, which is simply an image that can't be searched. And we said, we want to review this, and we couldn't scan it effectively with OCR. So Synopsys said, oh, we already have it in the database. They put it in the database for their own volition, and then they agreed to transfer it over to our database. Mr. Brothers, you've consumed your time. We'll give you a couple of minutes back, but first, Judge Price has a question. On the same point, the stratified... Obviously, the statute does not address very happily the whole issue of electronic production.  Right. But it seems to me your warehouse example may make a useful model for what I find problematical about this case. Because if you view the warehouse as being, let's say, Ricoh's warehouse, where Synopsys is producing stuff and sticking it in Ricoh's warehouse, and then Ricoh decides to go and look in the warehouse and pull out, make specific hard copies of 16,000 documents from that warehouse, then the production would seem to be at the point at which the things are put into Ricoh's warehouse, right? That would be... Well, I can see your point. The point is, Ricoh already paid for its warehouse. Well, it paid for half of it. Well, no, Ricoh paid for its warehouse. Synopsys paid for its warehouse. Half of the two warehouses. Fine. But if you say, okay, we don't really believe that putting it in your warehouse works. We're going to put it in the warehouse of an escrow, a third party. But we're going to produce to that warehouse. That's our production. And you can do with it what you want. The question is, why isn't that, analogously, admittedly, but nonetheless, why isn't that production in the sense that the statute refers to? I can give you three quick reasons to it. The first reason is that the parties... I guess the first and short reason is it's not within the scope of 1920. And the Supreme Court in Crawford fittings has said it's rigidly controlled, and we have to honor what is said there, and judges don't have the discretion to expand by analogy or otherwise what is the language of 1920. So that is the first answer. The second answer is that here RICO has already paid for. In fact, RICO was taxed. I understand that. No, let me get this. Okay. Three times RICO paid for and was included in the taxation the disks, the actual media that contained the ESI that was given to Stratify. Those are 191 CDs and DVDs as reflected in 2228 and 2232. Those invoices. RICO paid for those costs. They've been taxed. And the third reason? Well, thank you. The third reason is that there was a contract between the parties, and we have cited case law in which the parties have agreed, when the parties agree to certain costs, that those should not be taxed. Thank you, Mr. Burleson. We have two minutes of rebuttal time left to hear from Mr. Frankel. Thank you, Your Honor. May it please the Court. This was a case where RICO, the plaintiff, sued eight defendants. Seven defendants, Synopsys came in as a declaratory judgment plaintiff on behalf of its customers. It was a very complex litigation and a lengthy litigation. RICO's discovery requests were brought. Mr. Brothers stated that the local rule says that copying costs should be limited to responses to discovery requests. Yet RICO in its brief did not point out anything that Synopsys produced that was unrelated to its very broad discovery requests. Well, but I think the problem with respect to the copies of these documents is that the records do not disclose what was being copied or for whom the documents were being copied. I mean, we're talking about hundreds of thousands of dollars in copying costs. I mean, everybody who's done this sort of work understands that perfection is impossible. But the records here do seem to be rather uninformative. If you're going to claim costs for copying, shouldn't the records at least indicate some general notion of what's being copied? We do agree, Your Honor. But we think that in this case the record did disclose what the copies were for. RICO pointed out two examples in its brief, in its reply brief, of exhibits that it claims that were not related to production of documents, even though those invoices said production right on them. Production for what? I can't even tell from the invoices who's getting the copies. Are these copies that are being production documents that are being made for RICO? Are they copies that are being made for Synopsys? I can't tell. Again, Your Honor, if the documents were not to be produced to the other side, they would not have said production on them. And again, that's a finding that the district court made. And the district court carefully went through all 193 exhibits that Synopsys submitted. That's evident from the footnote that we were discussing that Judge Bryson brought up earlier, where the district court reduced an odd number, 32,700-something. But that's evidence that the district court went through. Who were the copies being made for? Well, for example, in the record A1912, there's Bates numbers for a $1,000 invoice. A1928, there are Bates numbers for a $25,000 invoice. Who are the copies being made for? Are these copies being made for RICO? Are these copies being made for Synopsys? Can I tell from the invoices? Yes, you can tell. But by these invoices that I'm mentioning, the ones that have Bates numbers, they were for production. These were documents that were produced. They relate to documents that were produced if they have Bates numbers on them, yes. But who's the copy going to? Is it a copy that's going to RICO, or is it a copy that's being kept by Synopsys? How can I tell? Okay. Well, I would suggest that the invoices that list on them that are for production, by implication, would be going to RICO. I mean, this was a case where there were hundreds of thousands of documents produced in response to RICO's request. They requested, for example, all documents relating to rules. And Synopsys is a company where their expert systems are based on the development of rules. It would be so hard to come up with an affidavit saying that these invoices represent copies of production documents that were being made for RICO, but we don't have such an affidavit, right? We do have affidavits that these were copies that were used for the production of documents. But it doesn't say who the documents are going to, right? Well, I think the word production in its own… No, it doesn't say who's getting the documents, right? Well, I do not think that it says that the production was made for RICO. But given that RICO was the opposing party, and given that the defendants were making the production, I think that it's fair that the declarations that were submitted, which said that these copying costs were for production, would have to be for RICO. In any case… Let me ask you that. For example, and I think you're opposing counsel referred to, the costs do not include copies of pleadings, motions, that sort of thing. Is that correct? I'm not exactly sure what Mr. Brothers is referring to. Well, I think that's the general rule, right? That you don't get copies of… you make a pleadings… Well, I would agree with that. I don't think that these copying costs were for pleadings. Well, in your declaration, and I'm looking at page 1354 of the appendix, you said that the fees for exemplification and reproduction, the fees are for reproduction, disclosure of formal discovery documents, and pleadings and other documents filed at the court. Now, that seems to me to, by its terms, to include some impermissible matter. Would you agree? Well, this is the June 10, 2010 declaration. At that time, Synopsys was seeking more. We had a meet-confer after this, and Synopsys did withdraw several items of costs. Do you know if this particular item was withdrawn? I cannot tell you for a fact. There are so many things that RICO challenged that I do not know, standing here today, whether or not that was one that was done. Well, this is just sort of an example of what I was troubled by generally, which is there's not a whole lot of really, to put it mildly, precise documentation in the copy area. Now, I recognize that we're talking about it could cost as much to keep track of the copies as it would cost to copy in the first place if you tried to do it with extraordinary precision. But there's a lot lower level than extraordinary precision, it seems to me, in this record. Well, I don't know if we agree with that, Your Honor. I mean, in Summit Technology v. NIDAC, that was a case where the don below, the winning party, didn't submit any invoices. This court reversed and said you need to do more than that. And then on remand, all they did was have an attorney testify about how much were the total amount of costs. We went through a much greater detail here. We submitted 193 invoices. We itemized them. The invoices each either say a base number or they say they were for production. We met and conferred with RICO. We withdrew ones that they fairly pointed out were outside of the statute. And one comment I want to make is the district court judge went through these, and the standard of review here is abuse of discretion. In the Ninth Circuit, which this court would apply Ninth Circuit law, what the Ninth Circuit refers to as abuse of discretion is whether there has to be an explanation that's from the district court judge that is either illogical, implausible, or without support in inferences that may be drawn from the facts in the record. And I suggest here, and that's from United States v. Hinkson, 585 F30-1247, and I suggest here the 193 invoices, the district court did go through them and did look at them as evidence from the footnote where the district court did withdraw some of the challenge costs. The other point I want to make is in the Ninth Circuit, the Save Our Valley case says that the district court doesn't even need to give any affirmative reasons. There's a presumption of costs. And that the appellate court is hesitant to find an abuse of the trial court's broad discretion over costs. It can't be a presumption that any cost that's claimed is recoverable. There has to be some kind of proof that it's an appropriate cost. And particularly, you know, if we were dealing here with a charge for $10.50 for copying, people wouldn't worry so much about, you know, whether we should have kept track of it better. Where it's hundreds of thousands of dollars, there's no reason. Is there that you couldn't set up a system that would just supply some basic information, like what was being copied, whether it was a production document or a pleading, and whether the copy was being given to RICO or whether it was being kept by Synopsys? That stuff is pretty basic. And if you're dealing with the kind of magnitude we're talking about here, it doesn't seem out of keeping to have a little bit better system of keeping track of what's involved. Well, Your Honor, below RICO did make that point that there were several charges that they felt that Synopsys had made for its own use. And Synopsys submitted a declaration by Denise DeMori, who was the attorney below, and submitted examples of invoices that had not been submitted in the bill of costs that had to do with preprocessing and making Synopsys' own copies. I know that one of the record pages is A3511, which has an example of that invoice. I've lost the rest for now. Mr. Feingold, what about the assessment of cost in the database where the parties have agreed to split the cost? The district court seemed to simply toss that off by saying, however, it is not an agreement as to the taxability, whether this taxability is different from the parties' separate agreement. That's right. Parties can agree to split costs up front for their own convenience because you don't know in a litigation who's going to win and who's going to lose. You should remember the facts here. There are several facts that we submitted. First of all, RICO had asked for a broad production of e-mail in a case involving computer code. Synopsys believed this e-mail was completely irrelevant to determining whether a customer defendant input was written in RTL or not. E-mail was not going to decide this case, and so Synopsys resisted. The magistrate judge ruled for RICO and said that while he thought that the e-mail was of borderline relevance, he wanted the parties to be preferred. What the jury is asking is whether when the parties agree to split the costs, whether we should assume that that means the costs are not going to be taxed against one party or the other. Whether we should assume that that's just an interim division of costs. And there's the Saunders case in the D.C. Circuit, which does support her position. There's a Third Circuit case, which is pretty brief, but to some extent seems to support the other position. What's the right assumption where parties make an agreement to split the costs and don't say this is subject later to the taxation costs or is not subject to taxation? What should we assume where there's an agreement that's signable as to the taxation costs later on? Well, I mean, I think that you should assume unless the parties agree to waive the taxability of costs, why can't parties split costs to try to keep litigation costs low for everybody? Why should that be used against a party if it then thereafter becomes a prevailing party? This was a database for production. It was a database for the convenience of RICO. There were 120 gigabytes. But an agreement to split costs would seem to imply that you're not going to ask the court to award them to you separately. Well, I don't think so, Your Honor. There was nothing in any of the correspondence where Synoptis said we're going to not ask the court for costs on the road. All it was, in fact, RICO suggested. Synoptis asked RICO to pay for all of it. It's very expensive, this Stratify database, as you can see. So the agreement to split costs is really, as you said, at least absent an explicit reference to taxation. It's just an agreement to each side will front one half. Subject to the fronting being reversed on the taxation. That's exactly right, Your Honor. And I fully expected that if RICO had taken this case to trial and won, it would have sought its share of costs that it paid for Stratify. And why not? I mean, that would have been a recoverable cost. These were costs for the production of documents, in this case, emails. And there were 120 different email custodians and over 100 gigabytes worth of email. Of those, RICO used perhaps seven emails in the first 100 depositions. This was a waste of money. It should not have been done in the first place. But the point is, if Synoptis had converted these documents to TIFs and Bates labeled them, which everyone admits would be taxable, it would have cost around $3 million. But the question is, it's sort of odd. He would have thought that with an agreement like this, which seems to have been carefully negotiated, that it would have dealt one way or the other with the taxability of the cost of this database at the conclusion of the litigation. It didn't. So there are two interpretations. One, that it was a temporary allocation of the burden subject to being taxed later, or that it was meant to be a permanent decision as to how it was going to be shared. How do we know which of those it is? Is there anything in this agreement that helps us answer what the party's intent was? Well, there's nothing in the agreement that addresses what's going to happen down the road if one party wins or the other. The Stratify agreement and the correspondence to the council are completely silent at that point. And so I think that you have to assume that a party is not waiving its rights under 19. Why do we have to assume that that's the point? Because I think that in order to waive a right to achieve costs, there has to be some explicit agreement that a party is going to do that. Here, the agreement was to front the costs. Synopsis said, Rico, you pay for the database. Rico said, no, we're not going to do that. The district court said, work it out amongst yourselves. Our proposal is we front the costs equally. Well, the word front I don't think was based on the ultimate agreement, right? It would obviously become easy if it were, because then it would be pretty evident that you were just making a temporary allocation. But it doesn't seem to be that that was the tenor of the agreement. And that leaves us with the question that Judge Duggan asked. Well, again, I don't think there's anything in the record that says that synopsis is going to waive costs for production if it ultimately prevails. That's certainly true, but it would be an easier case if it were. It would be. And the question is, should we reward litigants who try to work out an arrangement to not involve the magistrate? Because synopsis could have then signed a third protective order and said, we don't want to pay for it. Could I ask one more question on a different subject? Sure. One that, nonetheless, I guess it doesn't involve as much money as the subject we've been talking about, but it's still a vexing one, at least for me. And that is this question of whether duplicate copies of videotape and transcript depositions are available under both 1920 and the Northern District of California local rules. Now, I think everybody can agree there's no Ninth Circuit authority that specifically addressed that question. There are, however, a number of opinions from the Northern District of California in construing the local rules on that. Unfortunately, they divide just about equally one way or the other. What do we do with that problem? How do we decide how to construe the rules of the Northern District of California when the judges of the Northern District of California are exactly equally divided on that point? Right. Your Honor, I think that Judge White in the Heinex case probably did the best job of any of them in determining what to do. And I think that when this circuit is faced with trying to apply Ninth Circuit law and there's no Ninth Circuit case on point, which there isn't here. There is no Ninth Circuit case on point. It's instructive to look at the cases of other circuit courts. So we grade the different district judges according to how well they've analyzed this and then we say, you're right. You're not interpreting your own rules. Well, I... Because people live with these rules every day. We come to them virtually cold. It would be nicer if the Ninth Circuit had taken up one of these cases and decided for you. It's not an enraged position either. Right. But should there be some kind of default position here? Well, I think that... Default in favor of granting or in favor of denying? The Sixth Circuit in BDT and the Tenth Circuit in Tilton both, I think, had good reasons why the statute should be interpreted along both the written transcript and the video transcript. That's what Judge White relied on in Heinex and that's what the district court in this case relied on when relying on Heinex. And I think that's where we're going. I'm still confused because it seems to me it could make quite a difference who's asking for the blowback copy. And to get back to the fact that I can't tell from this record whether the blowback copy here was being asked for by RICO or whether it was being kept by Synopsys. It seems to me to make quite a difference. If RICO said, okay, in addition to the electronic production we'd like you to make a hard copy of this for us. It seems to me that's a pretty easy case that that ought to be taxed as costs. On the other hand, if it's an additional hard copy for Synopsys own use that's a different situation. I can't tell which it is, can I? I think that for the blowback copies, again, the invoices say production on them. That's all we can do here with this record. You're right, though. The word production to me implies it's being given to the other side. But I don't have the record of the shipping of the documents to the other side to prove that it made there. And I think that this puts it right in the summit that the review does not require such item-by-item precision. That's all I can do to answer that question. Thank you, Mr. Feuchel. Mr. Brothers has two minutes. In response, Judge Deck, to your question, the blowback, RICO never requested blowbacks. These were documents produced in electronic form to RICO. And what Synopsys chose to do, and whether it wanted to make hard copies for its own convenience, was its decision. How do I know that they were hard copies for its own convenience? Well, first of all, they bear the burden of proof. And if there is no evidence to support it, they fail in their burden of proof. I think we're talking about two different sets of blowbacks here. One is the blowbacks in connection with the copying. The other is the copies, the written transcripts of the depositions, right? Okay. Two different things. Well, that is a different issue. Okay. So you were addressing the former, and my colloquy with your opposing counsel was really addressing the latter. Yes, and let me turn to that, because the statute is written in the disjunctive. It says one or the other, the language of the statute. The language of the rule is in the disjunctive. The language of the statute doesn't really come close to discussing this whole subject. Fair point. The language of the rule is in the disjunctive. And although 1922 does say fees for printed or electronically reported transcripts necessarily obtained for use in the case. A written transcript is one. A videotape is the other. Who got the blowback copies of the transcripts? There were no blowback copies of the transcripts. The transcripts were purchased from the court report, and this is a separate issue. The blowbacks are hard copies of. . . I thought there was an issue. Maybe I'm mistaken. I thought there was an issue about electronically recorded depositions and hard copies of those depositions. There were. Who got the copies? Well, each side purchased their copies from the court reporter, and Synopsys sought taxation for all of their costs for all depositions. It's the hard copy that they ordered in addition to the electronic copy. It's both. They were taxed and we were taxed for Synopsys' expense for the hard copy transcript and Synopsys' expense for the videotape deposition, including depositions that RICO. . . But it's for them. It's for them. Yes. It is for them, and including expenses for depositions that RICO took to win its motion for partial summary judgment. RICO was taxed for winning. The district court simply failed to address that. Thank you, Mr. Brothers. For the benefit of the audience here, I think it's important to note that on issues implicating our court's exclusive jurisdiction, we rely on our own law. But on matters of procedure that don't implicate our own exclusive jurisdiction, we rely on regional circuit law, which is why you've heard all this discussion about non-circuit law. Judge Flory, may I just answer Judge Dyke's earlier question? Keymarked. You asked me the best case. Keymarked. Thank you, Mr. Brothers. Thank you, Your Honor.